# STATE OF MICHIGAN

# COURT OF APPEALS

---

KURT C. NIELSON,

      Plaintiff-Appellant,

v

SAFEGUARD PROPERTIES, LLC,

      Defendant-Appellee.

UNPUBLISHED
November 9, 2017

No. 333244
Oakland Circuit Court
LC No. 2015-149178-NZ

---

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

Defendant, Safeguard Properties, works with mortgage companies nationwide to secure properties that have been vacated following a mortgagor's default. In this case, Safeguard's agents entered a home that was clearly occupied but secured it anyway, resulting in inconvenience and expense to the home owner. The circuit court dismissed the home owner's lawsuit in its entirety. Although the home owner could not establish that Safeguard was a "debt collector" for purposes of several statutory claims, he did present evidence that the individuals who entered his home were Safeguard's agents and that Safeguard could be held liable on trespass and conversion theories. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In April 2015, Kurt Nielson was in default on his mortgage loan held by CitiMortgage, Inc., but the mortgagee had yet to initiate foreclosure proceedings. On April 22, Nielson received a letter from Citibank Preservation instructing him to call within 10 days to advise whether his "home was occupied or vacant." Nielson complied and Citibank Preservation acknowledged receipt of Nielson's call. Even so, that weekend while Nielson was away, workers hired by Safeguard entered Nielsen's home to "secure" it. The workers "rummaged through" Nielson's belongings, emptied his refrigerator, helped themselves to some of his personal property, and let his cat out. They also "winterized" the plumbing and locked him out of the house by attaching lock boxes on his doors. When Nielsen returned and discovered that he could not get into his house, his neighbor delivered a door tag that had been left with him. The tag advised that the workers found the home "vacant" and therefore Safeguard Properties, acting on behalf of Nielson's mortgagee, "secured" the property and added it to a "monthly maintenance schedule." The notice provided the number to "P & P Customer Service" to call in

-1-

the event the home became "unsecure" or an emergency arose. It advised, "When calling, please have the full address and zip code of the property so that we can efficiently assist you."

Nielsen called the number and received the code to get into his house. Inside his home, Nielsen found a letter explaining the mortgagee's "right to inspect [the] property to verify occupancy and to determine whether securing the property is necessary." The letter advised:

> Based on the initial inspection of the exterior of your home, it was determined that the property was vacant and in need of securing. As a result, the securing process was begun by changing a lock on one door to the home all other locks remain accessible as before. After gaining entry to the property, however, it was determined that the property was occupied. Therefore, no further work was performed, no items were removed and the home was locked.

The writer "sincerely apologize[d] for this inconvenience" and provided another number to call "so we can make immediate arrangements to rectify this matter."

Nielsen claims that Safeguard entered the house on two additional occasions, once "pil[ing] [his] personal property in his garage," and once "track[ing] dirt and debris throughout [the] home." At his deposition, Nielsen conceded that Safeguard never contacted him "to attempt to collect money due to your lack of payment on your mortgage."

Nielson subsequently filed suit alleging 11 different causes of action against Safeguard: violation of the federal Fair Debt Collection Practices Act, 15 USC 1692 *et seq.* (FDCPA); violation of the Michigan Regulation of Collection Practices Act, MCL 445.251 *et seq.* (MRCPA); violation of the Michigan Occupational Code, MCL 339.901 *et seq.* (MOC); violation of the Michigan Consumer Protection Act, MCL 445.901 *et seq.* (MCPA); "exemplary damages;" trespass to real property; trespass to personal property; "conversion and treble damages;" intentional infliction of emotional distress; statutory trespass under MCL 750.552; and "invasion of privacy/tortious intrusion."

Before the close of discovery, Safeguard sought summary disposition pursuant to MCR 2.116(C)(10). In relation to the FDCPA, MRCPA, MOC, and MCPA claims, Safeguard argued that it was not a "debt collector" as contemplated by the acts and therefore could not liable for any statutory violations. In relation to the tort counts, Safeguard asserted that it used independent contractors, rather than employees, to secure Nielson's property and could not be held liable for their wrongdoing. The court agreed and dismissed Nielson's complaint in its entirety. The court also rejected Nielson's bid to add a negligence count.

Nielson now appeals the circuit court's dismissal of his trespass and conversion counts, as well as his challenges based on the FDCPA, MRCPA, and MOC.

## II. SAFEGUARD IS NOT A "DEBT COLLECTOR"

The circuit court properly dismissed Nielson's claims under the FDCPA. MRCPA, and MOC. Those acts are inapplicable as Safeguard is not a "debt collector" as provided in the acts.

-2-

We review de novo a lower court's summary disposition ruling. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher*, 300 Mich App at 139-140.]

> We also review de novo matters of statutory interpretation. *Stanton v City of Battle Creek*, 466 Mich 611, 614; 647 NW2d 508 (2002). The goal of statutory interpretation is to discern and give effect to the intent of the Legislature. *Odom v Wayne Co*, 482 Mich 459, 467; 760 NW2d 217 (2008). To that end, the first step in determining legislative intent is the language of the statute. *Id.* If the statutory language is unambiguous, then the Legislature's intent is clear and judicial construction is neither necessary nor permitted. *Id.* [*Barclae v Zarb*, 300 Mich App 455, 466-467; 834 NW2d 100 (2013).]

## A. FDCPA

The FDCPA prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 USCA 1692e. The FDCPA regulates only the conduct of those who fall within the act's definition of a "debt collector." *Ruth v Triumph Partnerships*, 577 F3d 790, 796 (CA 7, 2009). 15 USC 1692a(6) defines "debt collector" as follows:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or *who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another*. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. *For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.* [Emphasis added.]

The two italicized segments of this subsection give rise to two different definitions of the term "debt collector," and both are relevant in this case. The first italicized section refers to the more typical understanding of a debt collector as a person that regularly collects or attempts to collect debts. The second is more complicated, as it references yet another subsection of the FDCPA, 15 USC 1692f(6), which provides:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--
>
> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or disablement.

The second part of the definition of "debt collector" applies to repossession agents and similar entities that would otherwise fall outside the scope of the first definition of a "debt collector." An unpublished federal district court opinion aptly summarizes the parameters of this species of debt collector:

> Although a repossession agency generally is *not* considered to be a "debt collector," 15 [USC 1692a] creates a limited exception where the 'principal purpose' of the business is the enforcement of security interests and it violates 15 [USC 1692f(6)] by dispossessing an individual of property where "there is no present right to possession." [*Lee v Toyota Motor Sales USA Inc*, unpublished order of the federal Northern District of California, entered September 6, 2016 (Docket No. 16-CV-03195-JCS).]

Thus, the FDCPA describes two types of "debt collectors:" (1) a person who regularly collects or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, and (2) a person "whose business has the principal purpose of enforcing security interests but who does not otherwise satisfy the definition of a debt collector[,]" and who acts in a manner consistent with § 1692f(6). *Kaltenbach v Richards*, 464 F3d 524, 527 (CA 5, 2006). Nielsen asserts that Safeguard satisfies one or the other of these two definitions. The evidence does not support his claims.

The first definition of "debt collector" captures any person who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Nielsen contends that Safeguard "regularly collects or attempts to collect . . . indirectly" debts owed to mortgage companies. Nielsen appears to rely on "the paperwork" left

-4-

with his neighbor and inside the house as his evidence that Safeguard indirectly attempted to collect a debt when it entered and secured his home.

In *Romine v Diversified Collection Servs, Inc*, 155 F3d 1142, 1147 (CA 9, 1998), the United States Court of Appeals for the Ninth Circuit held that a service offered by defendant Western Union that "was 'specially developed for the credit and collections industry' " satisfied the "indirect" debt collection method. Western Union mailed debtors a notice that there was a "personal delivery telegram" being held for them that could be delivered only if the debtor supplied his or her telephone number. The recipient was told to call a Western Union operator to request the telegram, so that a caller ID system could record his or her unlisted telephone number. When the debtor called, the operator elicited the caller's personal information and read a message instructing the caller to "immediately" contact an office offering debt refinancing services. *Id*. at 1144. Western Union advertised that this service would " 'stimulate recoveries dramatically.' " *Id*. at 1143-1144. The Court summarized that Western Union "obtain[ed] debtors' telephone numbers by eliciting responses to personal delivery telegrams, then disseminate[d] the unlisted numbers to creditors and collection agencies." *Id*. at 1143. The Ninth Circuit concluded that this activity could constitute "an indirect attempt to collect a debt." *Id*. at 1147.[1]

The United States Court of Appeals for the Third Circuit relied on *Romine* in *Siwulec v JM Adjustment Servs, LLC*, 465 Fed Appx 200 (CA 3, 2012), which involved a somewhat different approach to indirect debt collection. The defendant, JMAS, hand-delivered letters from Chase, the recipient's lender, seeking information to assist Chase "in 'resolv[ing]' " a " 'past due' " loan. *Id*. at 201 (alteration in orginal). According to the plaintiff's complaint, after she accepted the letter, the JMAS representative dropped some documents on her lawn "contain[ing] standard instructions and procedures provided by JMAS to its agents." *Id*. The documents did not include any of the disclosures required under the FDCPA. *Id*.

JMAS contended that it was merely a "messenger service," not a "debt collector." The Third Circuit concluded otherwise, summarizing:

> Given the facts as alleged, JMAS is no mere messenger service for debt collectors. Compare *Udis v Universal Communications Co*, 56 P3d 1177 (Colo App, 2002) (finding *Romine* persuasive on interpretation of Colorado's analogous FDCPA and holding that a company that markets its services gathering debtor contact-information to debt collectors is covered by the Act) with *Laubach v Arrow Serv Bureau, Inc*, 987 F Supp 625, 631-632 (ND Ill, 1997) (holding that printing and mailing of collection letters on behalf of debt collector did not render mailing company debt collector for FDCPA purposes). In addition to delivering letters, JMAS representatives are instructed to urge alleged debtors, in person, to call the creditor while they watched. They were to gather contact information from the debtors directly, to speak with their neighbors, and to conduct a visual

---

[1] The Colorado Court of Appeals adopted this analysis in an almost identical case, *Udis v Universal Communications Co*, 56 P3d 1177, 1179 (Colo App, 2002).

assessment of their properties. These activities bring JMAS out of any messenger exception and into the coverage of the FDCPA, which was certainly intended to regulate in-person debt collection visits.

Consequently, we find that the amended complaint sufficiently alleged that JMAS was a debt collector for purposes of the FDCPA because the principal purpose of JMAS's business is the collection of debts and JMAS regularly engages in indirect debt collection. [*Siwulec*, 465 Fed Appx at 204.]

Federal district courts in the Northern District of Illinois have invoked the reasoning in *Romine* and *Siwulec* in several cases involving Safeguard and other "mortgage service" companies, and Nielsen relies heavily on these district court cases in his argument. Unfortunately for Nielsen, the facts of *Romine*, *Siwulec*, and the Illinois cases are distinguishable from his case.

For example, *Simpson v Safeguard Props, LLC*, unpublished opinion of the federal Northern District of Illinois, issued June 12, 2013 (Docket No. 13-CV-2453), arose in the context of a motion filed under Fed R Civ P 12(b)(6) seeking judgment on the pleadings. Simpson claimed that after her mortgage company (Midland) informed her that she was in default, Safeguard representatives left five notes on her door, described by the district court as follows:

All five notes were identical, and the front of each one read, "IMPORTANT INFORMATION ENCLOSED[.]" The reverse side of each note included the following instructions: "IMPORTANT[,]" "PLEASE CALL[,]" "PLEASE BE READY TO GIVE YOUR ACCOUNT NUMBER[,]" and "WE ARE EXPECTING YOUR CALL TODAY." A phone number was handwritten in a space provided on each note, the same number as the one Midland Mortgage listed for its loan counselors in the notice of default. [Id., slip op at 2 (emphasis and alteration in original).]

Simpson alleged that Safeguard's agents left the notes while performing "field agent" services for Midland, in violation of the three provisions of the FDCPA. *Id*.

Safeguard insisted that it was not a "debt collector" as defined by the FDCPA, and accordingly was entitled to summary judgment. The district court determined that based on the pleadings, Simpson had properly stated a claim:

Simpson alleges that Safeguard . . . markets its services to mortgage companies with delinquent and defaulted borrowers. The complaint further states that Safeguard advertises field services that it provides to its clients, and among these services are communicating with delinquent borrowers on behalf of mortgage companies, contacting mortgagors to request that they call mortgage companies, and reporting back to mortgage companies whether it has made contact with mortgagors and regarding the condition of mortgaged properties. These are well-pleaded factual allegations that the court must accept as true.

Although Simpson does not allege that Safeguard collects or attempts to collect debts on behalf of mortgage companies, entities that contact consumers

attempting to facilitate communication with creditors have been found to be "debt collectors." See [*Siwulec*, 465 F Appx at 204] (holding that field service in which an agent contacts and encourages a debtor to call the creditor is more than "mere messenger service for debt collectors"), [*Romine*, 155 F3d at 1149] (holding that Western Union's practice of disseminating to creditors telephone numbers that were obtained by eliciting personal responses to telegrams sent to debtors goes "beyond mere information gathering or message delivery"). Safeguard argues that the facts in Simpson's complaint demonstrate that Safeguard is merely a messenger. However, the allegation that Safeguard markets its services to mortgage companies makes it reasonable to infer that Safeguard attempts to regularly facilitate the collection of debts, which the court finds qualifies under § 1692a(6) as "regular[] . . . attempts to collect, . . . indirectly, debts . . . asserted to be owed or due another." Because the court must draw this inference, as it must draw all reasonable inferences in Simpson's favor, it also finds that the complaint sufficiently alleges that Safeguard is a debt collector. [*Id*., slip op at 3-4.]

A second chapter of *Simpson* recently unfolded following cross motions for summary judgment filed under FRCP 56, *Simpson* v *Safeguard Props, LLC*, unpublished opinion of the federal Northern District of Illinois, issued September 28, 2017 (Docket No. 13-CV-02453). The basic facts described in the court's initial opinion remained unchanged. In addition, the court noted that Safeguard had admitted that it markets its services to mortgage companies, "refers to itself as a 'privately held mortgage field services company' that 'inspects and maintains defaulted and foreclosed properties for mortgage service companies, lenders, investors, and other financial institutions,' " and "advertises 'communicating with delinquent borrowers' as a service it provides." *Id*., slip op at 4. Safeguard classified its activities at the Simpson home as "contact attempt inspection" (CAI). *Id*. Other services provided by the company include "cutting the grass, winterizing pipes and utilities, and installing a lock box if the property becomes vacant." *Id*. Door hangers are left if the property is occupied. *Id*.

The district court denied summary judgment to either side, ruling that disputed evidence necessitated a trial. *Id*., slip op at 8. In finding a triable issue for the plaintiff, the court relied on the placement of the door hangers demanding a call to the mortgage company (assuming the plaintiff could prove that they were designed by Safeguard) in combination with the fact that Safeguard was " 'dispatched to the homes of particularly delinquent debtors as part of [Midland's] debt collection efforts.' " *Id*., slip op at 9, 12. This evidence supported Simpson's claim that Safeguard *indirectly* attempted to obtain payment "through personal solicitation," thereby rendering Safeguard a debt collector. *Id*., slip op at 12-13. The court concluded:

> Weighed as a whole, the summary judgment evidence could support a jury decision for either side on whether Safeguard is a "debt collector" when it performs its [CAIs]. If inclined to see things Simpson's way, the [CAIs], a jury could decide, have a principal purpose of encouraging a debtor, with all the subtext of a visible reminder of an in-person visit and a handwritten note (five in Simpson's case), to call Midland, so it can attempt to obtain payment for debt. . . . The contrary conclusion, consistent with Midland's Rule 30(b)(6) depositions and the undisputed fact that Safeguard receives limited information from Midland,

would also be reasonable with the benefit of inferences favorable to Safeguard. [*Id*., slip op at 13-14.]

A handful of other Northern District of Illinois cases offer facts closer to those of the case at hand, in which Safeguard or other "mortgage service" representatives actually entered a home and "secured" it. Notably, however, all of the cases Nielsen cites involve motions for summary judgment on the pleadings rather than motions filed after discovery.

In *Schlaf v Safeguard Props, LLC*, unpublished order of the federal Northern District of Illinois, entered February 16, 2016 (Docket No. 15-CV-50113), slip op at 2, the plaintiff's mortgage company "hired Safeguard to determine the physical status of plaintiff's home, including whether it was abandoned, and to conduct a contact inspection." Safeguard performed the inspection and left a door hanger instructing the plaintiff to call the mortgage company and to have his account number ready. *Id*. The plaintiff's complaint also quoted extensively from Safeguard's website, which advertised that Safeguard's inspectors " 'will make up to three attempts on behalf of mortgage servicers and lenders to provide contact information to delinquent borrowers,' " would leave door tags " 'in an effort to have the mortgagor call the client,' " and recommended that " '[CAIs] are a servicer's best option for contacting borrowers who are unable to be reached.' " *Id*., slip op at 1-2. The district court found that Safeguard was a "debt collector" under 15 USC 1692a(6), reasoning:

> Safeguard sold a service to make three attempts at a face-to-face encounter with a debtor, and to leave a written message, all with the alleged intent that the debtor should contact the mortgage servicer to assist in that servicer's collection efforts. As with <u>Simpson</u>, those *allegations* are sufficient to plausibly suggest that Safeguard "attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." [*Id*., slip op at 3-4 (emphasis added).]

Here, no evidence supports that Safeguard qualifies as a debt collector under the first definition. The record is devoid of evidence substantiating that Safeguard regularly collects or attempts to collect debts directly. Nielsen produced no communications from Safeguard to himself or others seeking payment. Nor do the record facts support that Safeguard's "securitization" services were performed as part of a direct effort to collect payment.[2]

Relying on the "indirect" language of the statute, Nielsen argues that "[t]he door hanger left with Plaintiff's neighbor, is a communication in connection with the collection [of] a debt, despite not explicitly mentioning any debt." The door hanger includes only one brief reference to Nielsen's mortgage company ("Safeguard Properties, on behalf of the mortgage company, will be maintaining the property to ensure it does not sustain any additional damages."). This statement is far removed from the language on the door hangers found to be indirect attempts at

---

[2] "[T]he Act's substantive provisions indicate that debt collection is performed through either 'communication,' . . . § 1692c, 'conduct,' . . . § 1692d, or 'means,' . . . §§ 1692e, 1692f. These broad words suggest a broad view of what the Act considers collection." *Glazer v Chase Home Finance LLC*, 704 F3d 453, 461 (CA 6, 2013).

debt collection in the Northern District of Illinois cases. Those door hangers instructed the homeowners to call their lenders and to have their mortgage information at hand when they did. The unspoken threat inferable from the door hangers in combination with the lock-outs was: pay your mortgage if you want this to stop. As the district court put it, the evidence in the Illinois cases supported that Safeguard indirectly attempted to facilitate the lender's collection of a mortgage debt. Here, however, the communication did not even mention a debt.

Indisputably, Safeguard's conduct was unwanted, unnecessary (the home was lived-in, not abandoned or vacant), and, as Nielsen alleges, "intrusive." But any connection with debt collection was so indirect and insubstantial that deeming Safeguard a "debt collector" under the FDCPA would extend the reach of the statutory definition well beyond its plain meaning. The operative sentence defines a debt collector as someone "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Nielsen has presented no evidence of the "regularity" of Safeguard's alleged collection efforts, or that debt collection was an indirect reason for Safeguard's visits to his home. The evidence supports only one reasonable inference: Safeguard's acts were in furtherance of the purpose stated in the door hanger and the letter it left in Nielsen's home, which was to secure the property. Safeguard's belief that "securitization" was warranted was mistaken. But that fact does not transform its acts into debt collection activity.

Nor can Nielsen satisfy the second definition of a "debt collector." Again, by way of reminder, the operative language for the second definition is:

> For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business *the principal purpose of which is the enforcement of security interests.* [15 USC 1692a (emphasis added).]

15 USC 1692f(6) provides:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--
>
> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or disablement.

Nielsen claims that by entering his home, placing locks on his doors, "winterizing" the plumbing, emptying his refrigerator, and taking some of his personal property, Safeguard

nonjudicially dispossessed or disabled his property without a right to take possession of the property. A number of courts have determined that Safeguard or similar companies met this definition of a "debt collector," at least at the pleading stage.

In *Flippin v Aurora Bank, FSB*, No. unpublished opinion of the Northern District of Illinois, issued August 8, 2012 (Docket No. 12-CV-1996), slip op at 1, Mortgage Contracting Services, Inc., "changed the locks on the [plaintiff's] home and 'winterized' it by turning off the water." Like Safeguard, MCS was "in 'the business of securing and preserving property for mortgage lenders and others in the foreclosure industry.' " *Id*., slip op at 3. According to the plaintiff, MCS personnel also took jewelry and other valuable property from the home. *Id*., slip op at 2. The district court refused to dismiss the case on the pleadings. It found the plaintiff's allegations that her mortgage company had hired MCS to turn off the water and to change the locks adequate at the pleading stage to support a claim that MCS operated as a "debt collector" under § 1692a(6). *Id*., slip op at 4.

The facts of *Bywater v Wells Fargo Bank, NA*, unpublished opinion of the Northern District of Illinois, issued March 24, 2014 (Docket No. 13-CV-4415), also resemble those presented there. The plaintiff's FDCPA complaint alleged that after she had defaulted on her mortgage, her mortgagee instructed LPS Field Services to "winterize" her home, which included changing the locks. LPS arranged for subcontractors to bid on this job; A-Son's Construction, Inc. won the bid. *Id*., slip op at 2. A-Son's forcibly entered the plaintiff's home, changed her locks, and, according to the complaint, stole personal items. *Id*., slip op at 2-3. LPS and A-Son's moved for summary judgment on the pleadings, contending that they were not "debt collectors" under the FDCPA. *Id*., slip op at 10.

The court denied summary judgment, relying on the second definition of "debt collector:"

> One of plaintiffs' allegations against LPS and A-Son's, however, permits plaintiff to take advantage of a broader definition of "debt collector." Under 15 [USC 1692f(6)], it is an "unfair or unconscionable" practice violative of the FDCPA to take or threaten "nonjudicial action to effect dispossession or disablement of property," if, among other things, there is no present right to possession of the property through an enforceable security interest. Section 1692a(6) expands the definition of "debt collector" for purposes of liability under section 1692f(6); for purposes of that subsection, a debt collector "also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." [*Id*.]

The court ruled that plaintiff's allegations sufficed to bring LPS and A-Son's within this definition. The court observed that the plaintiff claimed that LPS and A-Son's had acted "in concert" as "part of an effort to evict her and her family from the home[.]" *Id*., slip op at 11. These allegations brought the defendants within the scope of subsection 1692f(6), the court ruled: "The complaint alleges that both LPS and A-Son's are in the business of securing properties for mortgage lenders in connection with foreclosures, . . . which is sufficient to bring them within the scope of section 1692a(6)'s expanded definition of a 'debt collector.' " *Id*. Several other cases cited in *Bywater* employ the same analysis and reach the same result.

As Safeguard points out, there is contrary authority as well. The plaintiff in *Alqaq v CitiMortgage, Inc*, unpublished opinion of the Northern District of Illinois, issued April 29, 2014 (Docket No. 13-CV-5130), slip op at 1, brought a putative class action against Safeguard and other defendants, alleging that the class members were threatened with "dispossession or disablement of their homes and [actually] dispossessed before" foreclosure judgments issued. The facts alleged in the complaint included that after foreclosure proceedings launched but before the mortgagee had a right to possess the property, Safeguard posted a notice on the home stating: "We found this property to be vacant/abandoned. This information will be reported to the mortgage holder. The mortgage holder has the right and duty to protect this property. The property will be rekeyed and/or winterized within 3 days. If this property is NOT VACANT, please contact Safeguard Properties at 877-340-8482." *Id.*, slip op at 4-5 (emphasis omitted). During the next several weeks, Safeguard returned on more than one occasion, "broke into the house and 'winterized' the property," stole personal items, and again posted stickers summarizing what it had done. *Id.*, slip op at 5. The plaintiff contended that Safeguard qualified as a "debt collector" under 15 USC 1692f(6)(A) because it took nonjudicial action to effect dispossession or disablement of the property to enforce a security interest. *Id.*, slip op at 6.

The district court acknowledged that Safeguard's conduct as alleged "appears to have been improper and even tortious as performed," but found that it was not a violation of the FDCPA. *Id.*, slip op at 7-8. The court reasoned:

> Federal mortgage regulations, Illinois law, and municipal ordinances impose strict duties on mortgagees to properly secure and protect foreclosed property from deterioration. In order to comply with law and regulations relating to foreclosed property, mortgagees employ firms who specialize in property management to perform the action required. The "principal purpose" of such businesses is not debt collection or the enforcement of security interests, but rather securing property. [*Id.*, slip op at 8.]

In other words, the court ruled that Safeguard's actions were "incidental to debt collection" and "not dispossession or disablement of [the] property." *Id.*, slip op at 10.

A newer, published case from the Northern District of Illinois reaches essentially the same conclusion. *Hunte v Safeguard Props Mgt, LLC*, __ F Supp 3d __ (ND Ill, 2017), slip op at 2, arose from Safeguard's "seizure" of the plaintiff's home after the plaintiff defaulted on his mortgage but before foreclosure. According to the complaint, Safeguard emptied the home of the plaintiff's personal possessions, changed the locks, and winterized the plumbing. *Id.* Safeguard filed a motion for summary judgement on the pleadings, contending that Safeguard was not a "debt collector" under the FDCPA. The plaintiff argued that Safeguard's "principal purpose" is not to collect debts (thereby disavowing reliance on § 1692a(6)), but to enforce security interests, bringing Safeguard within § 1692f(6). *Id.*, slip op at 3. The district court observed that the plaintiff's complaint had indeed alleged that " 'Safeguard's principal purpose is the enforcement of security interests.' " *Id.*, slip op at 4. However, another paragraph in the complaint averred that Safeguard's " 'principal purpose [is to] manage and preserve at-risk and foreclosed properties.' " *Id.* (alteration in original). In his brief, the plaintiff relied on the latter paragraph, highlighting that "Safeguard's *principal purpose* is to manage and preserve at-risk and foreclosed properties,' " and also asserted that "Safeguard 'has as *a primary purpose* the

-11-

enforcement of security interests[.]' " *Id*. (emphases in original). Focusing on the difference between a "principal purpose" (the words of the last sentence of § 1692a(6)), and "primary purpose," the court found that the plaintiff had not engaged in "alternative pleading," but rather essentially conceded that Safeguard's "principal purpose" was managing and preserving at-risk property and not enforcing security interests. *Id*., slip op at 4-5. The court elaborated:

> The pertinent portion of § 1692a(6) defines "debt collector" as an entity "*the* principal purpose of which is the enforcement of security interests." 15 [USC 1692a(6)] (emphasis added). Not "a principal purpose of which," but "*the* principal purpose of which." Congress's use of the definite article to modify "principal purpose" means that Congress intended to cover only entities having one principal purpose, that of enforcing security interests. . . . Thus, if [the plaintiff] meant to allege that Safeguard had two principal purposes, the allegation would take Safeguard outside the FDCPA's definition of "debt collector" even though one of those purposes was enforcing security interests. See *Rockridge Trust v Wells Fargo, NA*, 985 F Supp 2d 1110, 1137 (ND Cal, 2013) ("[T]he [complaint] alleges that 'one of the principal businesses of [Wells Fargo] is debt collection on a regular basis.' . . . [This] establishes only that debt collection is some part of Wells Fargo's business. For Wells Fargo to be a debt collector . . ., Plaintiffs must allege that the principal purpose of Wells Fargo's business is debt collection, not that one of Wells Fargo's principal businesses is debt collection.") (second brackets in original). [*Id*., slip op at 5-6 (emphasis in original).]

Nielsen's complaint alleges in ¶ 3 that "the principal purpose" of Safeguard's business "is the collection of debts." The affidavit submitted by Safeguard in support of summary disposition asserts that Safeguard "is a mortgage field services company" that "provide[s] preservation services for real estate throughout the country," "does not engage in the practice of debt collection." and "does not attempt to collect debts of any kind." Nielsen brought forward no evidence to refute these averments.

The plain language of § 1692a(6) bestows "debt collector" status on those "who use[] any instrumentality of interstate commerce or the mails in any business *the principal purpose* of which is *the enforcement of security interests*." (Emphasis added.) While the affidavit does not directly address "security interests," it does disclaim that Safeguard plays any part in the collection of "debts." Enforcers of security interests are "debt collectors" under the FDCPA. The first sentence of the statute states that "[t]he term 'debt collector' means . . . ." The last sentence reads: "For the purpose of section 1692f(6) of this title, such term also includes any person" who uses interstate commerce in a business having as "the principal purpose" the enforcement of security interests." 15 USC 1692a(6). Therefore, the affidavit's omission of a specific reference to security interests is inconsequential.

Safeguard's entry into Nielsen's home, its destruction of his property, and the lock-out it executed arguably effected a "dispossession or disablement of the property." And perhaps a side-effect of this conduct was to encourage Nielsen to pay his mortgage and to eliminate the risk of Safeguard's return. But the legal question presented is whether Nielsen has substantiated that Safeguard has as its "principal purpose . . . the enforcement of security interests." If not collecting debts "indirectly," Safeguard is liable as a "debt collector" only if it is "principally" in

the security interest enforcement business. Because Nielsen failed to bring forward any evidence refuting that Safeguard's "principal purpose" is property management rather than security interest enforcement, his claim under the FDCPA must fail.

## B. MRCPA and MOC

Two Michigan statutes address unfair or abusive debt collection practices: the MRCPA, MCL 445.251 *et seq.*, and the MOC, MCL 339.901 *et seq.* The MRCPA addresses the "debt collection practices" of "collection agencies" and "regulated persons." A "collection agency" is:

> a person that is directly engaged in collecting or attempting to collect a claim owed or due or asserted to be owed or due another, or repossessing or attempting to repossess a thing of value owed or due or asserted to be owed or due another person, arising out of an expressed or implied agreement. Collection agency includes an individual who, in the course of collecting, repossessing, or attempting to collect or repossess, represents himself or herself as a collection or repossession agency, or a person that performs collection activities that are regulated under article 9 of the [MOC], . . . MCL 339.901 to 339.920. [MCL 445.251(1)(b).]

Nielsen argues that because Safeguard "engages in collection activities," it is a "collection agency" under the MRCPA. This argument is unpersuasive. Unlike the FDCPA, the MRCPA encompasses only "direct[]" debt collection. No evidence suggests that Safeguard *directly* endeavored to collect Nielsen's overdue mortgage payments. Nor is there evidence that Safeguard "directly engaged" in "repossessing or attempting to repossess" Nielsen's home. At best, Safeguard's efforts were *indirect*, and in the section of his brief discussing the FDCPA, Nielsen concedes this point.

MCL 445.251(1)(b) also includes "a person that performs collection activities that are regulated under article 9 of the [MOC]." The relevant subsection of the MOC defines a "regulated person" as:

> a person whose collection activities are confined and are directly related to the operation of a business other than that of a collection agency including any of the following:
>
> (*i*) A regular employee who collects accounts for 1 employer if the collection efforts are carried on in the name of the employer.
>
> (*ii*) A state or federally chartered bank that collects its own claim.
>
> (*iii*) A trust company that collects its own claim.
>
> (*iv*) A state or federally chartered savings and loan association that collects its own claim.
>
> (*v*) A state or federally chartered credit union that collects its own claim.

-13-

(*vi*) A licensee under the regulatory loan act, . . . MCL 493.1 to 493.24.

(*vii*) A business that is licensed by this state under a regulatory act that regulates collection activity.

(*viii*) An abstract company that is engaged in an escrow business.

(*ix*) A licensed real estate broker or salesperson if the claim the broker or salesperson is collecting is related to or in connection with the broker's or salesperson's real estate business.

(*x*) A public officer or a person that is acting under a court order.

(*xi*) An attorney who is handling a claim or collection on behalf of a client and in the attorney's own name. [MCL 339.901(b).]

Nielsen's development of this issue in his brief is superficial and conclusory. He offers no explanation of how Safeguard falls within one of the MOC categories. Safeguard simply does not "collect accounts," rendering the MOC inapplicable.

### III. TRESPASS AND CONVERSION COUNTS

Nielson also challenges the circuit court's summary dismissal of his trespass and conversion counts. At this stage, there remain genuine issues of material fact, rendering summary disposition inappropriate. Specifically, the circuit court erred by dismissing Nielsen's trespass and conversion claims on the ground that Safeguard used only independent contractors at Nielsen's home. Safeguard does not deny that the independent contractors were carrying out Safeguard's orders by entering Nielsen's home, emptying the refrigerator, and placing new locks. The evidence supports at least an inference that Safeguard directed and controlled these actions. The evidence also supports Nielsen's claim of agency by estoppel. Thus, whether the independent contractors acted as Safeguard's agents is a fact question.

" 'Agency' in its broadest sense includes every relation in which one person acts for or represents another by his authority." *Saums v Parfet*, 270 Mich 165, 171; 258 NW 235 (1935) (quotation marks and citation omitted). The Supreme Court highlighted in *Saums* that determining whether an agency exists necessitates an examination of "the relations of the parties as they in fact exist under their agreements or acts." *Id*. (quotation marks and citation omitted). The Court reiterated these principles in *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Michigan Ed Ass'n*, 458 Mich 540, 558; 581 NW2d 707 (1998) (citation omitted), adding that "the right to control the conduct of the agent with respect to the matters entrusted to him" is also fundamental to the agency relationship.

An independent contractor, on the other hand, carries out an "independent business" by agreeing "to do a piece of work according to his own methods, and without being subject to control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work." *Utley v Taylor & Gaskin, Inc*, 305 Mich 561, 570; 9 NW2d 842 (1943) (quotation marks and citation omitted). But "[i]f the employer of a person or business ostensibly labeled an 'independent contractor' retains control over the method of the work, there is in fact

no contractee-contractor relationship, and the employer may be vicariously liable under the principles of master and servant." *Candelaria v BC Gen Contractors, Inc*, 236 Mich App 67, 73; 600 NW2d 348 (1999).

In examining the relations between the parties, we must remain mindful that the labels that the parties assign to their relationship are not dispositive. "[I]f an act done by one person in behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding he is not so called." *Van Pelt v Paull*, 6 Mich App 618, 624; 150 NW2d 185 (1967) (quotation marks and citation omitted). Furthermore, whether an agency relationship exists and a defendant acted within the scope of its authority are jury questions. *Lincoln v Fairfield-Nobel Co*, 76 Mich App 514, 520; 257 NW2d 148 (1977). Alternatively stated, "Where there is a disputed question of agency, any testimony, either direct or inferential, tending to establish agency creates a question of fact for the jury to determine." *Meretta v Peach*, 195 Mich App 695, 697; 491 NW2d 278 (1992).

The common law also recognizes a subset of agency relationships alternatively called agency by estoppel and ostensible agency. This concept holds a principal liable for the acts of another even if the other does not technically qualify as an agent. Under certain circumstances a principal may be estopped from disputing the scope of an agent's authority despite that the principal does not control the putative agent's actions. See *Howard v Park*, 37 Mich App 496, 498; 195 NW2d 39 (1972). The elements of this form of agency are:

> (1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the agent's authority must not be guilty of negligence. [*Chapa v St Mary's Hosp*, 192 Mich App 29, 33-34, 480 NW2d 590 (1991).]

Safeguard avers that it hires "independent contractors" to perform the services that it offers to mortgage companies: securing and preserving property. But Safeguard's identification of the workers who entered Nielsen's home as "independent contractors" does not necessarily resolve whether the workers were actually controlled by Safeguard or held out as its ostensible agents. The record supports that either agency theory could apply in this case.

The evidence indicates that the workers did exactly what Safeguard told them to do: enter the home, change the locks, winterize the plumbing, and discard the food in the refrigerator. In this sense, the workers were apparently controlled by Safeguard. The property clearly was occupied rather than vacant; had the workers been able to exercise their own discretion, it seems obvious that they would not have thrown anything away, winterized the plumbing, or changed more than one lock. Further, the door tag prepared by Safeguard states that *Safeguard* was hired by the mortgage company to "maintain[] the property," to "secure[]" it, and to place it on a "monthly maintenance schedule": precisely the work that was performed. A "sign in sheet" was also left inside the home, which stated:

> This sign in sheet is posted by Safeguard Properties, Inc., as a request of the mortgagee to track all parties entering the property. It is required that all persons

entering this property provide an explanation of their visit and sign and date this form.

Please notify Safeguard Properties at 800-852-8306 Ext 2158 immediately if an emergency situation is discovered at this property. . . .

The letter left at the home explained that "the securing process was begun by changing a lock on one door," apologized for the entry, and offered the same telephone number for questions.

Nielson also presented a copy of his email correspondence seeking compensation for the food in his refrigerator, and the cost of "dewinterizing" his plumbing, and reimbursement for his missing items. The person who replied identified herself as "P & P Resolution Specialist, Safeguard Properties." This evidence supports that Safeguard held out the workers as its own. Nielsen reasonably believed that Safeguard was responsible for the entry of his home; all of the information left by the intruders identified them as Safeguard workers. There is no plausible explanation for this other than that Safeguard sought to take responsibility for what happened in the home.

The fact that the workers possibly committed a tort is not dispositive. "Just as a master is responsible for the torts of his servant which are committed within the scope of employment, a principal is responsible for the torts of his agent which are committed within the scope of the agency." *Cronk v Chevrolet Local Union No 659*, 32 Mich App 394, 401; 189 NW2d 16 (1971), citing 3 Am Jur 2d, Agency, § 267, p 631. More recently, this Court explained:

> A principal may be vicariously liable to a third party for harms inflicted by his or her agent even though the principal did not participate by act or omission in the agent's tort. Vicarious liability is indirect responsibility imposed by operation of law. Courts impose indirect responsibility on the principal for his or her agent's torts as a matter of public policy, but the principal, having committed no tortious act, is not a "tortfeaser" as that term is commonly defined. Because liability is imputed by law, a plaintiff does not have to prove that the principal acted negligently. Rather, to succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently. Concomitantly, if the agent has not breached a duty owed to the third party, the principal cannot be held vicariously liable for the agent's actions or omissions. [*Bailey v Schaaf (On Remand)*, 304 Mich App 324, 347; 852 NW2d 180 (2014) (quotation marks and citations omitted), vacated in part on other grounds 497 Mich 927; 856 NW2d 692 (2014).]

This principle is also reflected in the Restatement Agency, 3d, § 7.04 (2006), which provides:

Agent Acts with Actual Authority

A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and

(1) the agent's conduct is tortious, or

-16-

(2) the agent's conduct, if that of the principal, would subject the principal to tort liability.

One of the Restatement's "illustrations" describing § 7.04 resembles the facts presented here:

> 3. P, who owns Blackacre Towers, leases an apartment in it to T. P then wishes instead to lease T's apartment to S. P tells S to enter T's apartment and remove and destroy T's personal property. S does so. Entering T's apartment and removing and destroying T's personal property is tortious. P is subject to liability to T. S is also subject to liability to T whether or not S acted as P's agent.

The record evidence plausibly demonstrates that Safeguard directed that workers it hired would enter the Nielsen home, "preserve" the property in a manner dictated by Safeguard, and "secure" it by placing locks on the doors. A reasonable jury could find that the people carrying out Safeguard's instructions were its agents, or that Safeguard held them out as its agents. That their conduct may have been tortious does not relieve Safeguard of responsibility as a principal.

The evidence also supports a second legal basis for holding Safeguard responsible for the torts allegedly committed by the people who entered and secured Nielsen's home: that the workers sent to the home acted in concert with Safeguard. Under longstanding Michigan precedent, the "concert of action" theory allows a plaintiff to hold a defendant liable for the tortious conduct of others, if the defendant acted in concert with the others in causing the plaintiff's injury. In *Fisher v Rumler*, 239 Mich 224, 226; 214 NW 310 (1927), five police officers from two different jurisdictions illegally entered the plaintiff's house to search for a bootlegger. In the process, one of the officers "detained" a young girl, who sued for false imprisonment and assault and battery. *Id*. at 226-227. A jury awarded the girl $1,000. Two defendants argued on appeal that the evidence did not support that they had personally assaulted or falsely imprisoned the child. *Id*. at 227. The Supreme Court rejected this defense, reasoning:

> We think it not important that the evidence does not disclose which of the two in fact restrained the plaintiff nor which in fact committed the incidental assault and battery. There was concert of action. Both were liable for the acts of either in the scope of their joint enterprise. . . . Their primary purpose, as has been noted, was to discover evidence of violation of the prohibitory law, and their ultimate purpose was to apprehend the offender or offenders. We think the court was right in holding that restraint of the person or persons then in charge was within the common plan. [*Id*. at 227-228 (citations omitted).]

The Supreme Court reaffirmed the concert of action theory of liability in *Abel v Eli Lilly & Co*, 418 Mich 311, 338; 343 NW2d 164 (1983).

Here, the evidence supports that Safeguard and its contractor acted pursuant to a common design. That the contractor was not named as a defendant is unimportant, as the concert of action theory may be applied even in cases involving unnamed defendants. *Cousineau v Ford Motor Co*, 140 Mich App 19, 32-33; 363 NW2d 721 (1985). On this basis as well as agency, the court erred in summarily dismissing Nielsen's trespass and conversion claims.

## IV. AMENDMENT OF THE COMPLAINT

At the summary disposition hearing, Nielson requested for the first time that it be allowed to amend its complaint. Nielson claimed that he was unaware that Safeguard used independent contractors until Safeguard filed its motion for summary disposition. Based on this new information, Nielson desired to raise a claim of negligence against Safeguard.

We review for an abuse of discretion a trial court's decision to deny a motion for leave to amend. *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 666; 760 NW2d 565 (2008). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d (2006).

MCR 2.116(I)(5) provides that when a court grants summary disposition under MCR 2.116(C)(10), "the court shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." MCR 2.118(A)(1) grants a party the right to file one amendment within 14 days of receiving the defendant's answer. All other amendments require the court's permission or a stipulation of the parties. MCR 2.118(A)(2). The court rules dictate that "[l]eave shall be freely given when justice so requires." *Id*. "Leave to amend should be denied only for particularized reasons, such as undue delay, bad faith, or dilatory motive on the movant's part, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or where amendment would be futile." *Jenks v Brown*, 219 Mich App 415, 420; 557 NW2d 114 (1996).

Nielsen waited until the last possible moment to raise his amendment request. The record demonstrates that Nielsen had not engaged in any discovery regarding the circumstances surrounding the entry into his home, making him responsible for his own lack of knowledge. By the time the motion was heard, witness lists had been filed and the discovery period had closed. While the amendment standard is generally liberal, Nielsen's delay in seeking amendment was protracted. The circuit court's ruling does not fall outside the range of principled outcomes.

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

-18-